[Cite as *Stueve v. Stueve*, 2025-Ohio-2359.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| SARAH S. STUEVE | : | |
| | : | C.A. No. 30331 |
| Appellee | : | |
| | : | Trial Court Case No. 2023DR00167 |
| v. | : | |
| | : | (Appeal from Common Pleas Court- |
| DOUGLAS STUEVE | : | Domestic Relations) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 3, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


[[Applied Signature]]
_____
MICHAEL L. TUCKER, JUDGE


[[Applied Signature 2]]
_____
RONALD C. LEWIS, JUDGE

[[Applied Signature 3]]

MARY K. HUFFMAN, JUDGE

**OPINION**
MONTGOMERY C.A. No. 30331


JAY M. LOPEZ & CHARLYNE L. ADAMS, Attorneys for Appellant
CRAIG M. SAMS, Attorney for Appellee


LEWIS, J.

{¶ 1} Appellant Douglas Stueve appeals from a qualified domestic relations order issued by the Montgomery County Court of Common Pleas, Domestic Relations Division. For the reasons that follow, we affirm the judgment of the trial court.


I.      Course of Proceedings

{¶ 2} On March 8, 2023, Appellee Sarah S. Stueve filed a complaint for divorce. According to the complaint, she married Douglas on April 20, 2002, and they had two children who were born in 2006 and 2017, respectively.  Sarah also filed a motion for temporary orders.

{¶ 3} On March 21, 2023, Douglas filed his answer and counterclaim for divorce.  On that same date, Douglas also filed a motion for temporary custody and support and interim parenting time.

{¶ 4} On May 22, 2023, the trial court issued agreed temporary orders relating to the parties' contact with each other and parenting time.  Sarah was given exclusive use of the marital residence.

{¶ 5} A final evidentiary hearing was scheduled for July 30, 2024.  According to the scheduling order, the remaining contested issues were allocation of parental rights and

responsibilities, child support, property allocation, and private school tuition. At the beginning of the July 30, 2024 hearing, the trial court noted that the parties had contacted the court the previous week to state that they were nearing a settlement of the remaining contested issues. The court then asked trial counsel to explain which issues had been settled and which issues remained contested. Counsel explained that all the property issues, including the retirement division, had been resolved, but there was still disagreement regarding parenting time. The court suggested that counsel take additional time to discuss settlement before the hearing continued. Later that day, the parties came to an agreement on the remaining issues.

{¶ 6} Both parties then testified at the hearing. Sarah and Douglas agreed that they had reviewed the draft of the divorce decree; they believed the division of their assets and liabilities was fair and equitable and that the terms of the decree were in the best interest of the children. No provisions of the decree were read into the record, and neither party testified about how they intended their retirement accounts to be divided.

{¶ 7} On September 2, 2024, the trial court entered a final judgment and decree of divorce. Sarah was named the legal custodian and residential parent of the children. "SECTION VIII: DIVISION OF PROPERTY" of the divorce decree stated, in relevant part:

> The parties stipulate that the date of division of assets shall be January 1, 2023, unless specifically provided otherwise herein.
>
> All tangible and intangible personal property belonging to the parties shall be divided between them as follows:
>
> . . .
>
> D. Retirement Plans/Pension Benefits:
>
> Husband owns a 401(k) account through Fidelity with an approximate

balance of $1,138,666.32 as of January 1, 2023. Wife owns a Fidelity account consisting of a 401(k) and Rollover IRA with an approximate balance of $657,579 as of September 30, 2022. *All retirement is marital in nature. The marital portion shall be defined as the time from April 20, 2002 (Date of Marriage) through January 1, 2023 (Date of Division).*

The parties agree that the accounts shall be equalized, so that a Qualified Domestic Relations Order shall be prepared to divide the parties' respective retirement accounts. The QDRO shall divide said accounts equally as of January 1, 2023, plus or minus any investment gains or losses. Any loan balances shall be EXCLUDED from the division.

. . .

The parties agree that all retirement plans/pension benefits have been disclosed.

(Emphasis added.) Divorce Decree, p. 9. The decree did not make any other mention of the parties' retirement plans. and there was no discussion or identification of separate property within the decree. Neither party appealed from the divorce decree.

{¶ 8} On the date it issued the divorce decree, the trial court also issued an order for the parties to file a qualified domestic relations order ("QDRO") within 30 days. When the parties failed to file the QDRO within this time frame, the trial court issued an order to show cause relating to the parties' failure to timely file the QDRO.

{¶ 9} On November 20, 2024, Sarah filed a "Notice of Opposition" in which she explained that Douglas had submitted a QDRO that contained language in conflict with the terms of the divorce decree. The record does not contain a copy of the QDRO Douglas purportedly submitted. Sarah stated that she was submitting contemporaneously with her

notice a QDRO for the court's signature, which she contended was consistent with the divorce decree.

{¶ 10} On November 22, 2024, the trial court issued a QDRO that apparently reflected the language Sarah had submitted to the court in her version of the QDRO. The QDRO stated that the retirement plan subject to the QDRO was Douglas's "Precision Strip Retirement and Savings Plan." The QDRO stated that it related to marital property rights with an April 20, 2002 date of marriage and a January 1, 2023 valuation date. Paragraph 9 of the QDRO stated, "[Sarah's] interest in the Plan shall be $235,818.14 of the Participant's total vested account balance under the Plan as of the Valuation Date." Paragraph 15 of the QDRO stated, in part: "Neither Party shall accept any benefits from the Plan which are the property of the other Party."

{¶ 11} On November 25, 2024, Douglas filed a motion to modify the QDRO. He asked the trial court either to find that his version of the QDRO was consistent with the divorce decree or to modify Sarah's version of the QDRO to exclude Douglas's premarital interest from the retirement division. Douglas did not identify in his motion to modify how much, if any, of his retirement plan balance was separate property earned outside the marriage.

{¶ 12} Douglas filed a notice of appeal from the trial court's November 22, 2024 QDRO. At the time the notice of appeal was filed, the trial court had not ruled on Douglas's motion to modify the QDRO.

II. There Is No Evidence in the Record that the QDRO Is Inconsistent with or Modified the Terms of the Divorce Decree

{¶ 13} Douglas's sole assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION BY FILING THE PLAINTIFF'S QUALIFIED DOMESTIC RELATIONS ORDER WITHOUT ADDRESSING THE INCONSISTENT AND AMBIGUOUS RETIREMENT DIVISION TERMS WITHIN THE PARTIES' DECREE OF DIVORCE.

{¶ 14} "In any divorce action, the starting point for a trial court's analysis is an equal division of marital assets." *Neville v. Neville*, 2003-Ohio-3624, ¶ 5, citing R.C. 3105.171(C) and *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981). "However, R.C. 3105.171(C) clearly provides that where an equal division would be inequitable, a trial court may not divide the marital property equally but instead must divide it in the manner that the court determines to be equitable." *Id.*

{¶ 15} "Marital property" does not include "separate property." R.C. 3105.171(A)(3)(b). Rather, "[a]s defined in R.C. 3105.171(A)(3)(a), 'marital property' includes '[a]ll real and personal property that currently is owned by either or both of the spouses' and '[a]ll interest that either or both of the spouses currently has in any real or personal property, *including, but not limited to, the retirement benefits of the spouses*, and that was acquired by either or both of the spouses during the marriage.' " (Emphasis in original.) *Daniel v. Daniel*, 2014-Ohio-1161, ¶ 8, quoting R.C. 3105.171(A)(3)(a)(i) and (ii). Both vested and unvested retirement benefits acquired during the marriage are marital property. *Id.* at ¶ 9, 17.

{¶ 16} In contrast, "separate property" is defined as "all real and personal property and any interest in real or personal property that is found by the court to be any of the following," including, "Any . . . personal property or interest in . . . personal property that was acquired by one spouse prior to the date of the marriage." R.C. 3105.171(A)(6)(a)(ii). Moreover, "[t]he commingling of separate property with other property of any type does not

destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). "[T]he party claiming that an asset is separate property has the burden of proving the claim by a preponderance of the evidence." (Citations omitted.) *Hook v. Hook*, 2010-Ohio-4165, ¶ 19 (6th Dist.). "The duration of the marriage is critical in distinguishing marital, separate, and post-separation assets and liabilities, and in determining appropriate dates for the valuation of those assets and liabilities." *Pierron v. Pierron*, 2008-Ohio-1286, ¶ 12 (4th Dist.), citing *Pottmeyer v. Pottmeyer*, 2004-Ohio-3709, ¶ 12 (4th Dist.).

{¶ 17} "Once a court has made an equitable property division, it has no jurisdiction to modify its decision." *Id.* at ¶ 7, citing R.C. 3105.171(I) and *Knapp v. Knapp*, 2005-Ohio-7105, ¶ 40 (4th Dist.). However, the trial court does retain jurisdiction to " 'clarify and construe its original property division so as to effectuate its judgment.' " *Knapp* at ¶ 40, quoting *McKinley v. McKinley*, 2000 WL 897994, *4 (4th Dist. June 27, 2000).

{¶ 18} "Pension or retirement benefits earned during the course of a marriage are marital assets and a factor to be considered in the division of property." *Wilson v. Wilson*, 2007-Ohio-6056, ¶ 5, citing *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 178-179 (1990). "A QDRO is a qualified domestic relations order 'which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan.' " *Id.* at ¶ 6, quoting Employee Retirement Income Security Act of 1974, 29 U.S.C. 1056(d)(3)(B)(i)(I) and 26 U.S.C. 414(p)(1)(A)(i). " 'The QDRO must be drafted to include very specific information with explicit instructions to the plan administrator. It is then the responsibility of the plan administrator to review the order of the trial court and determine whether it constitutes a QDRO pursuant to Section 414(p), Title 26, U.S. Code.' " (Footnote omitted.) *Id.*, quoting

*Hoyt* at 180.

**{¶ 19}** "A QDRO implements the court's order dividing a pension plan in a decree of divorce or dissolution." *Pearl v. Pearl*, 2012-Ohio-4752, ¶ 11 (2d Dist.), citing *Wilson* at ¶ 7. "That division is not subject to future modification by the court except upon the express written consent or agreement of both spouses." *Id.*, citing R.C. 3105.171(I) and R.C. 3105.65(B). Therefore, a QDRO must be consistent with the decree to comply with R.C. 3105.171(I). An order that is inconsistent with the decree violates the prohibition against modifications in R.C. 3105.171(I) and is voidable for error. *Id.* at ¶ 16. "A QDRO modifies the decree when the QDRO varies from, enlarges, or diminishes the division and disbursement of retirement benefits ordered in the decree." *Id.* at ¶ 11, citing *Wilson* at ¶ 18.

**{¶ 20}** We consider whether a QDRO conflicts with a divorce decree as a question of law, applying de novo review. *Fitzgerald v. Fitzgerald*, 2024-Ohio-5419, ¶ 30 (6th Dist.). " 'In scrutinizing whether a QDRO impermissibly modifies a decree, a court does not engage in a mere exercise of textual comparison. Rather, the Court must discern whether the QDRO's provisions materially alter the rights and obligations established by the decree.' " *Id.*, quoting *Shaw v. Shaw*, 2024-Ohio-3231, ¶ 16 (12th Dist.).

**{¶ 21}** Douglas argues that the following two sentences within the divorce decree are ambiguous: "All retirement is marital in nature. The marital portion shall be defined as the time from April 20, 2002 (Date of Marriage) through January 1, 2023 (Date of Division)." According to Douglas, "[w]ith these two sentences, the instructions for the division of retirement benefits are ambiguous. This language could be interpreted to mean that the marital portion is all of the retirement. However, the terms could also mean the marital portion was defined as April 20, 2002 to January 1, 2023." Appellant's Brief, p. 9-10.

Douglas contends the parties agreed in the divorce decree that the marital portion of the retirement accounts would be divided equally, but any premarital portion of the retirement accounts would remain the parties' separate property. Finally, Douglas believes that since Sarah's counsel drafted the decree, any ambiguity must be resolved against her.

{¶ 22} Sarah responds that Douglas's appeal of the QDRO "is improper and an attempt to bypass the timing requirements to appeal the Decree." Appellee's Brief, p. 9. According to Sarah, the language in the QDRO is consistent with the language in the decree, and if Douglas had an issue with language in the decree, he should have filed a timely appeal from the decree, which he did not. Further, Sarah argues that Douglas made no separate property claim throughout the proceedings, and the language in the decree "specifying the dates of the marriage does not defeat the plain statement that 'All retirement is marital in nature.'" *Id.* at 11. Finally, Sarah contends that "[a]s the parties' agreement was a global settlement, isolating a single issue is improper. A finding that the trial court erred in adopting the parties' agreement as provided in the September 2, 2024 Final Judgment and Decree of Divorce creates global problems as the terms in the Decree were agreed upon as a whole." *Id.* at 12.

{¶ 23} Douglas's entire argument on appeal is based on his contention that the property division in the divorce decree was ambiguous, which resulted in a QDRO that improperly awarded Sarah a portion of Douglas's separate retirement property. As Sarah contends, it is questionable whether Douglas can challenge an alleged ambiguity in the divorce decree when he failed to file a direct appeal from the decree. However, we need not resolve that issue because Douglas's appeal fails for a more fundamental reason.

{¶ 24} Douglas's appeal is from the trial court's issuance of a QDRO. In order to successfully appeal from a QDRO, Douglas must show that the QDRO's terms conflicted

with or modified the terms of the divorce decree. *Pearl*, 2012-Ohio-4752, at ¶ 17 (2d Dist.). Douglas's argument on appeal relies entirely on his unsupported contention that the QDRO issued by the trial court improperly awarded some of his separate retirement property to Sarah. We must overrule Douglas's assignment of error because he does not cite any evidence in the record establishing that any separate retirement property existed, let alone that the trial court's November 22, 2024 QDRO awarded a portion of Douglas's separate retirement property to Sarah.

{¶ 25} The divorce decree stated that Douglas owned a 401(k) account through Fidelity with an approximate balance of $1,138.666.32 as of January 1, 2023, and Sarah owned a Fidelity account consisting of a 401(k) and Rollover IRA with an approximate balance of $657,579 as of September 30, 2022. No other information about these accounts was provided in the divorce decree. Importantly, there is no evidence in the record before us that any portion of the retirement accounts of either party constituted separate property that was earned prior to April 20, 2002, the date on which the parties were married. Douglas concedes on page eight of his appellate brief that "the parties did not present evidence before the [trial court] regarding their respective retirement accounts . . . ."

{¶ 26} On the date they were married, Douglas was 24 years old, and Sarah was 23 years old. The record is silent as to the parties' employers at the start of their marriage. There is evidence in the record establishing that Douglas was working for Precision Strip Inc. when Sarah filed her complaint for divorce and that Sarah was working for GE Aviation Systems at that time. But there is no information in the record before us as to when the parties started their jobs at Precision Strip Inc. and GE Aviation Systems. And there is no evidence as to how much money was in their respective retirement accounts, if any, at the time they were married in April 2002. Without that information, we cannot conclude that

there was *any* separate retirement property contained in the two retirement accounts addressed in the divorce decree.[1]   Moreover, without any of this information in the record, we cannot conclude that the November 22, 2024 QDRO conflicted with the divorce decree's equal division of the parties' retirement plans.

**{¶ 27}** Similarly, even if we were to address the issue of whether the property division in the divorce decree was ambiguous, we would be unable to determine, based on the record before us, whether the property division language in the divorce decree was ambiguous or simply redundant or complementary.   For example, if all of the monies contributed to the two retirement accounts listed in the divorce decree were contributed during the parties' marriage, then the following two sentences would be, at worst, redundant or complementary rather than ambiguous or conflicting:   "All retirement is marital in nature.   The martial portion shall be defined as the time from April 20, 2002 (Date of Marriage) through January 1, 2023 (Date of Division)."   Decree, p. 9.

**{¶ 28}** Douglas failed to direct us to any evidence in the record establishing that any separate retirement property existed, let alone that the QDRO or divorce decree improperly mandated the division of any separate property.   Based on the record before us, we cannot conclude that the QDRO was inconsistent with or modified the terms of the divorce decree. Therefore, the sole assignment of error is overruled.

   III.    Conclusion

---

[1] Douglas's reliance on *Palmieri v. Palmieri*, 2024-Ohio-2720 (10th Dist.), is misplaced.   In *Palmieri*, unlike the current appeal, there was clear evidence in the record that the trial court improperly awarded the husband's separate retirement property to his wife.   Specifically, the husband in *Palmieri* established that he was employed for "some 15 years prior to the marriage."   *Id.* at ¶ 30.

{¶ 29} Having overruled the assignment of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .


TUCKER, J. and HUFFMAN, J., concur.